UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

CHARLES B.,[1]                          )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )      No. 2:19-cv-00084-JPH-DLP
                                        )
ANDREW M. SAUL Commissioner of the      )
Social Security Administration,         )
                                        )
                    Defendant.          )

## ORDER

Plaintiff Charles B. requests judicial review of the denial by the

Commissioner of the Social Security Administration ("Commissioner") of his

application for Supplemental Social Security Income ("SSI") under Title XVI of the

Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below,

this Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and

**REMANDS** this matter for further consideration.

## I.    PROCEDURAL HISTORY

On May 4, 2015, Charles filed an application for Title XVI SSI benefits

with an alleged disability onset date of July 23, 2013. (Dkt. 10-3 at 2, R. 77; Dkt.

10-6 at 2, R. 222). Charles alleged disability resulting from small vessel disease,

congestive heart failure, chronic obstructive pulmonary disease ("COPD"),

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

emphysema, high cholesterol, high blood pressure, memory loss, sleep apnea, depression, and acid reflux. (Dkt. 10-7 at 3, R. 237). The Social Security Administration ("SSA") denied Charles' claims initially on July 24, 2015, and on reconsideration on November 6, 2015. (Dkt. 10-4 at 2, 12, R. 107, 117). On December 22, 2015, Charles filed a written request for a hearing, which was granted. (Dkt. 10-4 at 19, R. 124). On December 12, 2017, Administrative Law Judge ("ALJ") Whitaker conducted a hearing where Charles appeared in person and a vocational expert, Sharon Ringenberg, appeared telephonically. (Dkt. 10-2 at 41, 70, R. 40, 69; Dkt. 10-5 at 21, R. 208).[2] On April 18, 2018, ALJ Whitaker issued an unfavorable decision finding that Charles was not disabled. (Id. at 17-29, R. 16-28). On December 12, 2018, the Appeals Council denied Charles' request for review, making the ALJ's decision final. (Id. at 2, R. 1). Charles now seeks judicial review of the ALJ's decision denying SSI benefits. *See* 42 U.S.C. § 1383(c).

## II. STANDARD OF REVIEW

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other

---

[2] During the hearing, the ALJ admitted exhibits, including Charles' medical records documented through July 2017. (Dkt. 10-2 at 30-34, 38, R. 29-33, 37).

kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 416.920(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also*, 20 C.F.R. § 416.920 (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at step four to

determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 416.920(iv), (v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant—in light of his age, education, job experience, and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Charles is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford*

*v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to her conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

## III.  BACKGROUND

### A. Charles' Medical History

On July 22, 2013, Charles presented to the Indiana University Health ("IU Health") Emergency Department in Bloomington, Indiana reporting discomfort in the left side of his chest, left arm, and neck. (Dkt. 10-11 at 8-9, R. 443-44). Admitting physician Dr. Gregory S. Heumann treated Charles' pain with a heparin drip, sublingual nitroglycerin, and aspirin. (Id). Dr. Neal David Abdullah, a radiologist, conducted an x-ray examination of Charles' chest. (Dkt. 10-11 at 8, R.

443). The examination revealed no acute chest disease, but Dr. Abdullah found what appeared to be an old, stable bulla at the right lung apex. (Dkt. 10-11 at 8, R. 443). On July 23, 2013, Dr. James V. Faris performed stenting of Charles' mid-right coronary artery. (Id). During the procedure, Dr. Faris found acute coronary syndrome; non ST-segment[3] elevation myocardial infarction; hypertension; two-vessel coronary artery disease, including lesions of the left anterior descending and right coronary arteries; tobacco habituation; hyponatremia; and dyslipidemia. (Id). Dr. Faris' discharge instructions for Charles included cardiac rehabilitation. (Id).

On September 12, 2013, Dr. James N. Topolgus, Jr. performed an outpatient carotid duplex examination and determined that Charles' bilateral cerebrovascular examination was normal, and identified no significant areas of stenosis. (Dkt. 10-11 at 7, R. 442).

On September 13, 2013, Charles presented to IU Health—Bloomington complaining of chest pain. (Dkt. 10-11 at 6-7, R. 441-42). Dr. James S. Fix performed a cardiac catheterization and diagnosed Charles with continued patency of the right coronary stents; improvement in the appearance of the ramus lesion from two months prior with no significant disease elsewhere; and right common femoral angiogram for Perclose deployment. (Id. at 7, R. 442). Dr. Fix commented that Charles was "not having any significant macrovascular coronary stenosis for

---

[3] The ST segment on an electrocardiogram (ECG) normally represents an electrically neutral area of the complex between ventricular depolarization (QRS complex) and repolarization (T wave). In clinical terms, the ST segment represents the period in which the myocardium maintains contraction to expel blood from the ventricles. *ST Segment*, https://www.ncbi.nlm.nih.gov/books/NBK459364/.

his symptoms" and proposed that his symptoms were "non-cardiac or non-ischemic" in nature. (Dkt. 10-11 at 7, R. 442).

On January 22, 2014, Charles visited the IU Health—Bloomington Emergency Department, complaining of left sided chest pain, left arm pain with numbness, and shortness of breath. (Dkt. 10-8 at 59, R. 358). Dr. Christina Cabott performed an electrocardiogram ("ECG"), which revealed a normal sinus rhythm. (Id. at 62, R. 361). Charles' x-ray examination revealed no acute cardiopulmonary disease. (Id. at 70, R. 369). After speaking with the cardiologist on call, Dr. Cabott discharged Charles with a prescription medication for his chest pain and recommended that he follow up with his cardiologist, Dr. Heumann. (Id. at 61, 63-64, R. 360, 362-63).

On January 30, 2014, radiologist Dr. Sean M. Flynn performed an x-ray examination after Charles presented to IU Health—Bloomington complaining of shortness of breath and chest pain. (Dkt. 10-11 at 6, R. 441). Dr. Flynn found no evidence for pulmonary embolism and mild findings of paraseptal emphysema[4] with a large right apical bleb present. (Id)

On March 19, 2014, Charles presented to IU Health—Bloomington with complaints of chest pain. (Dkt. 10-11 at 5, R. 440). Charles' cardiologist, Dr.

---

[4] Emphysema is a long-term lung condition that causes shortness of breath due to damaged and enlarged air sacs in the lungs (alveoli). There are three morphological types of emphysema, Centriacinar, Panacinar, and Paraseptal. Paraseptal emphysema tends to localize around the septa or pleura. It is often associated with inflammatory processes, such as prior lung infections. *Emphysema*, https://ufhealth.org/emphysema.

Heumann, administered a Lexiscan injection,[5] which Charles tolerated well, and found no evidence of ischemic changes on the ECG examination. (Dkt. 10-11 at 5-6, R. 440-41). In response to Charles' reports of consistent and chronic chest pain, Dr. Heumann also performed an EKG stress test on Charles on March 19, 2014. (Dkt. 10-8 at 53, R. 352). Dr. Heumann found normal sinus rhythm, no ectopy, and no significant ST shifting. (Id).

On March 21, 2014, Charles visited Dr. Eric Trueblood, a pulmonologist, for a consultation. (Dkt. 10-8 at 33, R. 332). Dr. Trueblood noted that Charles was in no acute distress, and his cardiovascular signs included normal heart sounds, no murmurs, and no edema. (Id). Dr. Trueblood recommended a follow-up appointment in six weeks; that Charles stop smoking; and that Charles begin a thirty-day trial of Spiriva HandiHaler[6] and Albuterol inhalers to assist with his COPD. (Id. at 34, R. 333).

On May 9, 2014, Charles visited Dr. Trueblood for a follow-up appointment. (Dkt. 10-8 at 24, R. 323). Dr. Trueblood noted no acute distress; normal heart rate and rhythm; no edema; and that Charles was oriented to person, place, and time. (Id. at 26, R. 325). Dr. Trueblood recommended a continuation of the thirty-day trial of the Spiriva HandiHaler because it "helped [Charles] in the past." Dr. Trueblood also recommended that Charles continue using his continuous positive airway

---

[5] A Lexiscan injection is a pharmacologic stress agent indicated for radionuclide myocardial perfusion imaging (MPI) in patients unable to undergo adequate exercise stress. *Lexiscan (regadenoson) Injection*, https://www.lexiscan.com/.

[6] Spiriva HandiHaler is a long-term, once-daily, prescription maintenance medicine used to control symptoms of COPD by relaxing airways and keeping them open. COPD includes chronic bronchitis and emphysema. Indications for Spiriva Respimat *(tiotropium bromide) Inhalation Spray and Spiriva HandiHaler (tiotropium bromide inhalation powder)*, https://www.spiriva.com/.

pressure ("CPAP") machine nightly and that he cut back on or quit smoking. (Dkt. 10-8 at 27, R. 326).

On September 9, 2014, Charles visited the IU Health—Bloomington Emergency Department with the chief complaint of a cough causing him to have shortness of breath. (Dkt. 10-8 at 44, R. 343). Nurse Practitioner Iva Martin diagnosed Charles with COPD and emphysematous bronchitis. (Id. at 49, R. 348). Charles was discharged with prescriptions for Azithromycin and Prednisone. (Id. at 46, R. at 345).

On September 15, 2014, Charles visited Dr. Trueblood for a follow-up appointment concerning his COPD. (Dkt. 10-8 at 20, R. 319). Charles reported an improving upper-respiratory infection and compliance with using his CPAP nightly. (Id). Dr. Trueblood again recommended that Charles stop smoking, that he take Clonazepam for anxiety, that he continue to use Spiriva and Albuterol inhalers for his issues with COPD, and continue nightly treatments with his CPAP machine. (Id. at 22, R. 321).

On October 21, 2014, Charles visited his primary care physician, Dr. Karen Reid-Renner, at the Southern Indiana Family Practice Center in Bloomington, Indiana. (Dkt. 10-10 at 17, R. 421). Dr. Reid-Renner diagnosed Charles with COPD, depression, and mixed hyperlipidemia. (Id). She prescribed several medications, including Klonopin, Lipitor, a Combivent inhaler, and Zoloft. (Id. at 19-22, R. 423-26).

On January 20, 2015, Charles visited Dr. Reid-Renner for a medication review. (Dkt. 10-10 at 11, R. 415). During that visit, Dr. Reid-Renner noted Charles' complaints of chest and back pain, face numbness, knees giving out, back pain, and depression. (Id). Dr. Reid-Renner continued Charles' Zoloft, added Abilify for his depressive symptoms, and prescribed Lisinopril for hypertension. (Id).

On February 3, 2015, Charles completed a depression questionnaire at the Southern Indiana Family Practice Center. (Dkt. 10-9 at 30, R. 399). Dr. Reid-Renner started Charles on Norvase and noted that his depressive symptoms were better on Abilify. (Id. at 33, R. 402).

On March 23, 2015, Charles visited Dr. Reid-Renner with complaints of knee pain. (Dkt. 10-9 at 12, R. 381). Dr. Reid-Renner completed a general assessment, and prescribed Namenda for Charles' decreased memory and Xanax for his anxiety. (Id). Addressing Charles' depression symptoms, Dr. Reid-Renner continued Charles on Zoloft and increased his Abilify prescription. (Id).

On May 4, 2015, the Disability Determination Bureau referred Charles to an orthopedic surgeon, Dr. Robert J. Burkle, for an internal medicine and pulmonary examination. (Dkt. 10-11 at 39-40, R. 474-75). On June 9, 2015, Dr. Burkle performed a pulmonary examination and reviewed Charles' systems. (Id). Charles reported high blood pressure, daily chest pains, and feeling pressure "like being punched in the chest." (Id. at 39, R. 474). Charles also reported respiratory issues with COPD, emphysema, and sleep apnea; psychiatric issues with depression; lymphatic issues with high cholesterol; and indicated that he smokes two packs of

cigarettes per day. (Dkt. 10-11 at 39, R. 474). Charles refused the internal medicine physical examination, stating that he believed the referral was for a pulmonary test only. (Id. at 40, R. 475). Dr. Burkle's interpretation of the pulmonology results stated, "low vital capacity possibly due to restriction of lung volumes." (Id. at 43-44, R. 478-79).

On June 22, 2015, Dr. Leah A. Powell performed a consultative psychological evaluation of Charles. (Dkt. 10-11 at 46-53, R. 481-88). Charles indicated experiencing symptoms of depressed mood, irritability, difficulty concentrating and remembering, sleep difficulties, racing thoughts, anxiety, and suicidal thoughts. (Id. at 46-47, R. 481-82). During the mental status examination, Dr. Powell noted Charles' depressed and anxious mood. (Id. at 47, R. 482). She also found Charles to be cooperative, but display an indifferent attitude; have goal-oriented thought processes; evidence of distractibility; and have a compromised recent memory. (Id). Dr. Powell found Charles to have low average range in auditory memory; low average range in visual memory, visual working memory, and immediate memory; and borderline range in delayed memory performance. (Id. at 51, R. 486). Dr. Powell also determined that Charles had below average free recall performance; difficulty retrieving information from memory; and below average memory for details. (Id. at 49, R. 484). Dr. Powell found that Charles' cognitive functioning was consistent with the most cognitively impaired clinical groups, such as individuals with probable dementia of the Alzheimer's type-mild severity, autistic disorder, schizophrenia, and moderate to severe traumatic brain injury groups. (Id. at 51, R. 486). Dr.

Powell's diagnostic impressions included major depressive disorder, generalized anxiety disorder, and panic disorder. (Dkt. 10-11 at 50, R. 485). Dr. Powell concluded that Charles' presentation, level of functioning, and cognitive ability were contraindicated with work-related activities. (Id. at 51, R. 486).

On June 26, 2015, Dr. Shuyan Wang performed a consultative internal medicine physical examination of Charles. (Dkt. 10-11 at 54, R. 489). Charles reported that he was being treated for his depression and anxiety with Abilify. (Id. at 55, R. 490). He also reported that he had been suffering with osteoarthritis and lower back pain dating back twenty years. (Id). Charles denied drinking, but reported a thirty-five year history of smoking. (Id). The physical examination revealed a normal gait; appropriate IQ; obesity; depressed appearance; and regular heart rhythm and rate within the normal range. (Id. at 56, R. 491). After completing the physical examination, Dr. Wang reported that Charles was probably able to do a light duty job continuously and moderate duty job intermittently; could not walk or drive for long periods of time and would need restrictions for standing, weight lifting, and carrying; should not bend over frequently; and needed to avoid temperature change and high humidity. (Id. at 59, R. 494). Dr. Wang's diagnostic impressions included coronary artery disease, hypertension, hyperlipidemia, COPD, emphysema, gastroesophageal reflux disease, osteoarthritis, low back pain, obesity, obstructive sleep apnea, depression, anxiety, and memory problems. (Id. at 58-59, R. 494).

On July 10, 2015, Charles' next-door neighbor, Kathy Carnahan, was interviewed by a disability reviewer, Michelle Owens. (Dkt. 10-7 at 25, R. 259). Ms. Carnahan explained that she had known Charles for over thirty-five years and that she checks on him often. (Id). She stated that Charles had undergone major changes in the last year, including issues with his memory. (Id). Ms. Carnahan explained that Charles often forgot to take his medications, failed to remember appointments, and that he quickly became impatient with others. (Id).

On July 10, 2015, Dr. Ken Lovko, a state agency psychologist, completed a Mental Residential Functional Capacity Assessment for Charles. (Dkt. 10-3 at 9-12, R. 84-87). Dr. Lovko found Charles to be moderately limited in his ability to understand and remember detailed instructions. (Id. at 10, R. 85). Dr. Lovko also found that Charles had sustained concentration and persistence limitations, including moderate limitations in both his ability to carry out detailed instructions and in his ability to maintain attention and concentration for extended periods. (Id). In regard to Charles' ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and his ability to perform at a consistent pace, Dr. Lovko opined that Charles was moderately limited. (Id. at 10-11, R. 85-86). Dr. Lovko also found Charles to be moderately limited in his ability to interact appropriately with the general public and to maintain socially appropriate behavior. (Id. at 11, R. 86). Dr. Lovko concluded, however, that Charles' current cognitive abilities did not reflect the severe memory impairment suggested by Dr. Powell nor did it suggest a decline from his premorbid functioning. (Id. at 12,

R. 87; *see* Dkt. 10-11 at 51, R. 486). Instead, Dr. Lovko concluded that Charles' scores were not inconsistent with the IQ of an individual with a ninth-grade education. (Dkt. 10-3 at 12, R. 87). Moreover, Dr. Lovko found that Charles' "allegation of severity of functioning" was not supported by the totality of the medical evidence in the file. (Id). Rather, Dr. Lovko opined that the evidence suggested, to the extent that Charles was physically able, he could understand, remember, and carry out unskilled tasks; relate on a superficial and ongoing basis with co-workers and supervisors; attend to task for sufficient periods of time to complete tasks; and manage the stresses involved with unskilled work. (Id. at 12, R. 87).

On July 17, 2015, Charles visited Licensed Practical Nurse Terri Miller to undergo an echocardiogram.[7] (Dkt. 10-11 at 63, R. 498). Dr. John Yacoub interpreted the results and concluded that Charles' left ventricle size and left ventricular systolic function were normal; found trace mitral and tricuspid regurgitation; and found mild concentric left ventricular hypertrophy. (Id. at 64, R. 499).

On July 24, 2015, Dr. Sands, a state agency physician, completed a Physical Residential Functional Capacity Assessment. (Dkt. 10-3 at 8-9, R. 83-84). Dr. Sands found that Charles' exertional limitations included occasionally lifting or carrying

---

[7] An echocardiogram is a noninvasive (the skin is not pierced) procedure used to assess the heart's function and structures. During the procedure, a transducer (like a microphone) sends out sound waves at a frequency too high to be heard. When the transducer is placed on the chest at certain locations and angles, the sound waves move through the skin and other body tissues to the heart tissues, where the waves bounce or "echo" off of the heart structures. These sound waves are sent to a computer that can create moving images of the heart walls and valves. *Echocardiogram*, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/echocardiogram.

twenty pounds, frequently lifting or carrying ten pounds, standing or walking about six hours in an eight hour workday, and unlimited pushing and pulling (other than shown for lift and carry); postural limitations and only occasionally climbing ramps, stairs, ladders, ropes, scaffolds, balance, stoop (i.e., bend at the waist), kneeling, crouching (i.e., bending at the knees), and crawling; and no manipulative, visual, communicative, or environmental limitations. (Dkt. 10-3 at 8-9, R. 83-84). Based on the documented findings, Dr. Sands determined that Charles was not disabled. (Id. at 13, R. 88).

On July 27, 2015, Charles presented to IU Health—Bloomington Emergency Department reporting generalized edema and associated leg pain with shortness of breath. (Dkt. 10-11 at 67, R. 502). During the assessment, Nurse Practitioner Autumn Nonte conducted a physical examination and noted that Charles' cardiovascular examination showed regular rate and rhythm with no murmur or edema; his lungs were clear to auscultation, respirations non-labored, breath sounds equal, chest wall expansion symmetrical, and bilateral wheezed throughout; alertness and orientation to person, place, time, and situation; cooperative and appropriate mood and affect, normal judgment, non-suicidal. (Id. at 68-69, R. 503-04). Nurse Practitioner Nonte also noted that Charles reported "smok[ing] three packs of cigarettes per day." (Id. at 67, R. 502). An ECG reviewed by Nurse Nonte and Dr. Haewon Park revealed normal sinus rhythm. (Id. at 69, R. 504). A chest x-ray performed by radiologist Dr. Bruce Monson found no acute process in the chest. (Id. at 79, R. 514). Dr. Topolgus performed a left lower extremity venous

duplex, and concluded that Charles' left lower extremity vein appeared negative for deep vein thrombosis and superficial vein thrombosis. (Dkt. 10-11 at 77, R. 512). Charles was diagnosed with edema, discharged to his home, and instructed to follow up with Dr. Reid-Renner. (Id. at 74, R. 509).

During an August 31, 2015 follow-up visit with his cardiologist, Dr. Heumann, Charles reported that he was compliant with his medication, experiencing normal activities of daily living, and smoking one and a half packs of cigarettes per day. (Dkt. 10-12 at 6, R. 520). Dr. Heumann noted no acute distress; normal lung respiration and rhythm; normal heart rate and rhythm; and no heart murmurs. (Id). He prescribed a mild diuretic and recommended an echocardiogram. (Id. at 6-7, R. 520-21). On September 3, 2015, Charles underwent a transthoracic echocardiogram. (Id. at 3, R. 517). Dr. Heumann found a mild mitral annular calcification; a mildly sclerotic aortic valve, but otherwise normal left and right atria and ventricles; structurally normal pulmonic valves; and normal pericardium. (Id).

On October 16, 2015, state agency psychologist Dr. Joelle J. Larsen, completed a Mental Residual Functional Capacity Assessment for Charles at the reconsideration level. (Dkt. 10-3 at 25-28, R. 100-103). Dr. Larsen adopted Dr. Lovko's findings regarding Charles' mental limitations and noted "no updated [medical evidence of record] to indicate worsening." (Id).

On November 4, 2015, Dr. Brill, a state agency physician, completed a Physical Residual Functional Capacity Assessment at the reconsideration level.

(Dkt. 10-3 at 23-25, R. 98-100). Dr. Brill adopted Dr. Sands' opinion regarding Charles' limitations, but added environmental limitations including avoiding concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. (Dkt. 10-3 at 23-25, R. 98-100). After reviewing Charles' medical evidence through August 31, 2015, Dr. Brill concluded that Charles was not disabled. (Id. at 25, 29, R. 100, 104).

On February 15, 2016, Charles visited Dr. Reid-Renner for a medication follow-up. (Dkt. 10-13 at 39, R. 643). Dr. Reid-Renner assessed Charles with major depressive disorder. (Id. at 41, R. 645). She also prescribed Meloxicam, Carvedilol, and Lisinopril for Charles' hypertensive disorder. (Id)

On March 18, 2016, Charles visited Dr. Matthew M. Nobari of Premier Healthcare in Bloomington, Indiana for a follow-up visit to discuss his COPD. (Dkt. 10-12 at 32, R. 546). Charles stated that "if he walk[s] to his mail box about one quarter mile, he becomes short of breath and very tired . . . when he runs out of air it takes him awhile to recooperate (sic) from it." (Id). Dr. Nobari noted a non-productive cough and ongoing chest pain, and that Charles was non-compliant with his medications and not using Spiriva as directed. (Id). Dr. Nobari assessed Charles for the cough and mild COPD and encouraged him to use the Spiriva or risk a visit to the emergency department, hospitalizations, or exacerbations. (Id. at 35, R. 549). Dr. Nobari referred Charles to Dr. Douglas Geiger with Southern Indiana Radiological Associates. (Id. at 37, R. 551). On March 18, 2016, Dr. Geiger performed a chest examination and noted emphysematous changes in Charles'

upper lobes with a prominent right apical bleb or bulla. (Dkt. 10-12 at 37, R. 551). Charles' lungs and pleural surfaces otherwise appeared clear. (Id).

On May 2, 2016, Charles visited Dr. Reid-Renner after experiencing a panic attack and symptoms of anxiety. (Dkt. 10-13 at 34, R. 638). Dr. Reid-Renner's progress note indicated that Charles had been having suicidal thoughts and crying spells, and that his "wife" had to hide a gun. (Id. at 38, R. 642). Charles relayed to Dr. Reid-Renner that he "won't live like this." (Id). Dr. Reid-Renner prescribed Zoloft and Seroquel for Charles' symptoms. (Id. at 37, R. 641).

On May 16, 2016, Charles presented to the Putnam County Hospital Emergency Department in Greencastle, Indiana with hyperventilation type symptoms that manifested as chest tightness. (Dkt. 10-12 at 46, 48, R. 560, 562). He was also complaining of muscle aches, dyspnea, nausea, weakness, dizziness, and hands drawing up. (Id). Upon assessment, Dr. Steve Kissel found that Charles may be experiencing low blood sodium levels, or hyponatremia, which was most likely triggered from polypharmacy[8] or other prescription medications. (Id. at 50, R. 564). Dr. Raymond Vanvuren performed a chest x-ray which revealed that Charles' heart and mediastinum were of normal size and configuration, that his lungs and pleural spaces were free of active process, and his osseous structures normal. (Id. at 84, R. 598). Based on Charles' symptoms, Dr. Kissel conducted a brain CT scan, which showed normal ventricles, cisterns, and sulci, no masse, no abnormal fluid

---

[8] Polypharmacy is the practice of administering many different medicines, especially concurrently, for the treatment of a single disease. *Polypharmacy*, https://www.merriam-webster.com/dictionary/polypharmacy.

collections, no hemorrhages, and no lesions. (Dkt. 10-12 at 49, 85, R. 563, 599). After Charles' sodium level and blood pressure were monitored and his dizziness eventually resolved, he was discharged on May 19, 2016 with instructions to discontinue a number of his medications. (Dkt. 10-12 at 48, 50-51, R. 562, 564-65).

On June 2, 2016, Charles visited Family Medicine of Cloverdale in Cloverdale, Indiana in pursuit of a new primary care physician. (Dkt. 10-14 at 2, R. 664). Charles self-reported a previous diagnosis of bi-polar disorder and discussed several tragic events that had occurred over the past year contributing to his "many ups and downs." (Id). Physician Assistant Jessica Archer recommended that Charles engage in counseling and noted that Charles had psychiatric symptoms of anxiety, depression, and irritation. (Id. at 5, R. 667). In regard to his physical health, Ms. Archer found that Charles had no respiratory, cardiovascular, gastrointestinal, or musculoskeletal issues, but suffered with daily arthritis pain in his hips, ankles, and knees. (Id. at 3-6, R. 665-68).

On June 17, 2016, Charles began psychotherapy sessions at Centerstone for concerns related to his depression. (Dkt. 10-16 at 2, R. 742). During the intake evaluation, Charles reported pervasive sadness, overall dissatisfaction with life circumstances, a lack of identity due to being disabled, grief surrounding the loss of his brother-in law, difficulties with sleeping, and a lack of motivation. (Dkt. 10-16 at 2, R. 742). He reported suicidal ideation, but stated that he would not act on these feelings due to his caring for his girlfriend. (Id. at 15, R. 755). During the intake

evaluation, Jason T. Woods diagnosed Charles with major depressive disorder, single episode, unspecified. (Id. at 2, 10, R. 742, 750).

At a July 14, 2016 follow-up appointment at Family Medicine of Cloverdale, Charles reported right elbow swelling with no improvement over the past two weeks. (Dkt. 10-14 at 9, R. 671). Physician Assistant Kelsey Futter advised Charles to try Tylenol in addition to Meloxicam to relieve the arthritis-associated pain. (Id. at 11, R. 673).

On August 28, 2016, Charles returned to Centerstone for a therapy session. (Dkt. 10-16 at 2, R. 742). Charles reported generalized and pervasive sadness, overall dissatisfaction with life circumstances, low self-esteem, feelings of lack of identity due to being disabled, grief surrounding the loss of his brother-in-law, difficulties falling asleep, and lack of motivation. (Id. at 2, R. 742). Mr. Woods noted that Charles' goals and objectives will revolve around treating the depression, reducing the frequency and intensity of depressive symptoms, providing additional support as needed, and helping him return to a desired state of functioning. (Id. at 3, R. 743). Mr. Woods further noted that Charles had strengths in intelligence and insight into his condition, but needed coping skills and emotional support. (Id. at 3-4, R. 743-44).

On September 8, 2016, Charles visited Family Medicine of Cloverdale with complaints of trouble breathing with a mild cough exacerbated by humid weather, hypertension, and chest pain. (Dkt. 10-14 at 13, R. 675). The physical examination revealed normal heart sounds and regular heart rate; even and easy respiratory

effort with no use of accessory muscles; and decreased breath sounds. (Id. at 14, R. 676). Physician Assistant Archer referred Charles to a cardiologist for his reported chest pain, and gave him trial samples of Ventolin and Breo Ellipta inhalers for his COPD. (Dkt. 10-14 at 15, R. 677).

On September 23, 2016, Charles visited the Putnam County Hospital to address his chest pain. (Dkt. 10-15 at 4, R. 693). He underwent a treadmill echocardiography stress test, which revealed normal left ventricular function; mild sclerosis of the aortic valve; normal blood pressure response; and no arrhythmia. (Id. at 2-3, 8, R. 691-92, 697).

Charles returned to Family Medicine of Cloverdale on December 9, 2016 with complaints of depression, anxiety, and that his arthritis medication was not helping. (Dkt. 10-14 at 16, R. 678). During the mental status examination, Physician Assistant Archer noted an appropriate mood and affect and that Charles was doing well on his current medication with regard to his anxiety and depression. (Id. at 18, R. 680). Ms. Archer recommended that Charles cease smoking and that he start Wellbutrin to assist him in quitting. (Id. at 18-19, R. 680-81).

On March 13, 2017, Charles visited the Putnam County Hospital Emergency Room with complaints of left arm pain, muscle aches, and dizziness. (Dkt. 10-15 at 20-21, R. 709-10). Nurse Crystal Sanders ordered an ECG, which revealed normal results, including no acute process, no acute ischemia, and normal sinus rhythm. (Id. at 21, R. 710). Dr. Anthony Heavin, the emergency department physician, noted

clinical impressions of essential hypertension and mild hypomagnesemia. (Dkt. 10-15 at 26, R. 715).

Charles visited the Putnam County Hospital Department of Radiology on May 31, 2017 with complaints of lower back pain. (Dkt. 10-15 at 35, R. 724). Dr. Keith Landry conducted an x-ray of Charles' lumbar spine and found mild lumbar dextroscoliosis with disc degenerative changes present at each level of the lumbar spine, most significant at L3-L4. (Id. at 36, R. 725). Dr. Landry dictated his impressions, which included mild lumbar dextroscoliosis with disc degenerative changes. (Id). Dr. Landy's impressions also included a conflicting finding of no significant degenerative changes at L3-L4. (Id)

On June 23, 2017, Charles visited the Putnam County Hospital Sleep Laboratory for a split night sleep study to analyze the severity of his sleep apnea and determine the optimal CPAP level that could best control his apnea symptoms. (Dkt. 10-15 at 44, R. 733). Dr. Anand Bhuptani found that Charles experienced 123 apneas and 70 hypoapneas while asleep, and recommended a CPAP with a full face mask at a pressure of 16. (Id. at 45, R. 734).

On June 9, 2017, Charles visited Family Medicine of Cloverdale to follow up on his May 31, 2017 back x-ray and complaints of lower back and left hip pain. (Dkt. 10-14 at 26, R. 688). He stated that he continued to have lower back and left hip pain. Physician Assistant Archer noted that prolonged positions caused Charles' pain to worsen and that his left leg was weak. (Id. at 26, R. 688). During this visit, Charles' cardiovascular examination was normal; his mental status examination

revealed an appropriate mood and affect; and his chest walls were quiet with easy and even respiratory effort and decreased breath sounds. (Id. at 28, R. 690). Ms. Archer noted that with respect to anxiety and depression, Charles was doing well on his current medications, and she noticed an improved mood since starting low dose Effexor. (Dkt. 10-14 at 28, R. 690). Ms. Archer's impressions included chronic low back pain with radicular pain to the left leg. (Id). Ms. Archer scheduled a magnetic resonance imaging ("MRI") of the lumbar spine and a follow-up appointment to review the results. (Id).

On July 11, 2017, Charles underwent an MRI at the Putnam County Hospital Department of Radiology. (Dkt. 10-15 at 49, R. 738). Dr. Joseph E. Mulholland noted that the MRI revealed a moderately sized left paracentral herniated nuclear pulposus at L1-2, left sided disc herniations at L3-4 and L4-5, and a broad-based disc bulge at L2-3. (Id).

## B. Factual Background

Charles was fifty-one years old as of his alleged disability onset date of July 23, 2013. (Dkt. 10-3 at 2, R. 77). He has a ninth-grade education. (Dkt 10-7 at 3, R. 238). He reported previous self-employment and relevant past work as a mechanic. (Id. at 4-5, R. 238-39).

## C. ALJ Decision

In determining whether Charles qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process articulated in 20 C.F.R. § 416.920(a) and concluded that Charles was not disabled. (Dkt. 10-2 at 29, R. 28).

At step one, the ALJ determined that Charles had not engaged in substantial gainful activity since his alleged onset date of July 23, 2013. (Id. at 18, R. 17).

At step two, the ALJ found that Charles suffered from the following severe impairments: grade I diastolic dysfunction, coronary arterial sclerosis status post myocardial infarction and stent placement, COPD and emphysema, edema, obesity, arthritis of multiple joints, dextroscoliosis and degenerative disc disease of the lumbar spine, cognitive disorder, major depressive disorder, generalized anxiety disorder, and panic disorder. (Dkt. 10-2 at 18, R. 17).

At step three, the ALJ found that Charles' impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. §§ 416.920(d), 416.925, or 416.926. (Dkt. 10-2 at 19, R. 18). The ALJ specifically considered whether Charles' physical impairments met or medically equaled the criteria of Listing 1.02 for Major Dysfunction of a Joint; Listing 1.04 for Disorders of the Spine; Listing 3.02 for Chronic Respiratory Disorders; or Listing 4.04(C) for Coronary Artery Disease. (Id. at 19-20, R. 18-20). The ALJ found that Charles' physical impairments did not meet the specific criteria required for those Listings. (Id). The ALJ also considered whether Charles' mental impairments met or medically equaled the criteria of Listing 12.02 for Neurocognitive Disorders; 12.04 for Depressive, Bipolar, and Related Disorders; 12.06 for Anxiety and Obsessive-Compulsive Disorders; 12.11 for Neurodevelopmental Disorders; and 12.15 for Trauma and Stressor Related Disorders. (Id. at 20, R. 19). The ALJ found

that Charles' mental impairments did not meet the specific criteria required for those Listings. (Id).

After step three but before step four, the ALJ found that Charles had the residual functional capacity ("RFC") to perform "light work" with the following limitations:

- Occasionally lift, carry, push, and pull up to twenty pounds;

- Frequently lift, carry, push, and pull up to ten pounds;

- Sit for six hours in an eight-hour workday;

- Stand or walk in combination for six hours in an eight-hour workday;

- Limited to work that allows him to sit and stand alternatively, provided that, at one time he can only sit for thirty minutes, stand for thirty minutes, and walk for thirty minutes;

- Occasionally balance, kneel, crouch, crawl, stoop (but never stoop below the waist);

- Climb ramps and stairs, but never ladders, ropes, or scaffolds;

- No exposure to extreme cold, heat, wetness, humidity, unprotected heights, dangerous moving machinery;

- No concentrated exposure to respiratory irritants such as fumes, odors, dusts, and gases;

- Simple, routine, tangible, and repetitive work;

- No contact with the public;

- Tandem tasks with co-workers and supervisors;

- Limited to work that allows him to be off task five percent of the workday, in addition to regularly scheduled breaks.

(Dkt. 10-2 at 21, R. 20).

At step four, the ALJ concluded that Charles was unable to perform any of his past relevant work. (Id. at 27, R. 26).

At step five, relying on the vocational expert's testimony, the ALJ determined that Charles could perform other jobs that exist in significant numbers in the national economy, such as a routing clerk or office helper. (Dkt. 10-2 at 28-29, R. 27-28). Accordingly, the ALJ determined that Charles was not disabled. (Id. at 28, R. 27).

## IV. ANALYSIS

Charles challenges the ALJ's decision on two grounds. Charles first contends that the ALJ's RFC analysis is not supported by substantial evidence. (Dkt. 14 at 11-12). In support, Charles argues that the ALJ erred by impermissibly interpreting new and significant medical evidence without subjecting the medical records to expert review. (Id. at 12-14). Charles also contends that the ALJ erred in assigning little weight to Dr. Powell's opinion. (Id. at 12-13). Second, Charles argues that the ALJ's hypothetical posed to the vocational expert failed to account for all of his moderate limitations, including limitations with maintaining concentration, persistence, or pace and understanding, remembering, and applying information. (Id. at 16). The Court will consider these arguments in turn below.

## A. Whether the ALJ's RFC Assessment was Supported by Substantial Evidence

The Plaintiff argues that the ALJ's RFC is not supported by substantial evidence in the record. (Dkt. 14 at 12). Charles maintains that the record fails to support the ALJ's finding that Charles could engage in light work because his most recent treatment records demonstrate his worsening physical and mental health. (Id. at 12-15). If these records were properly assessed, the Plaintiff argues that the ALJ would have found a sedentary RFC for Charles and concluded that his mental limitations caused him to be off task more than 5% of the workday. (Id. at 11, 13).

In response, the Commissioner maintains that the ALJ's assessment of Charles' RFC is supported by substantial evidence in the record. (Dkt. 21 at 12-16, 19-21). The Commissioner argues that the ALJ conducted a proper evaluation of Charles' medical evidence and that she provided a logical bridge to her finding that Charles could perform light work. (Id). In particular, the Commissioner contends that the ALJ appropriately used the opinions of the reviewing doctors as guidance and that she reasonably considered the most recent treatment records in crafting Charles' RFC. (Id. at 17).

### 1. New Medical Evidence

The Plaintiff's strongest argument on appeal is that the ALJ erred by continuing to rely on outdated medical assessments and evaluating for herself the significance of this new medical evidence in order to craft Charles' RFC. (Dkt. 14 at 14, 15). Specifically, the Plaintiff contends that the ALJ erred by determining, without state agency review, that Charles' most recent 2017 diagnoses of peripheral

edema, arthritis of multiple joints, degenerative disc disease of the lumbar spine, and dextroscoliosis were "grossly consistent" with the SSA's 2015 assessments that found Charles physically capable of completing light work. (Dkt. 14 at 12, 14). The Plaintiff asserts that the ALJ could not make this determination without first obtaining an updated medical review of the evidence by a state agency doctor. (Dkt. 14 at 14). The Plaintiff argues that because the new medical evidence could have reasonably changed the reviewing doctors' opinions of Charles' physical limitations, the ALJ erred in relying on the outdated state agency assessments when crafting Charles' RFC and determining that Charles' new physical diagnoses did not restrict him from performing light work. (Id. at 12-13). The Plaintiff also argues that there were new mental health treatment records that demonstrated a decline in Charles' mental health that the ALJ failed to submit to medical scrutiny, rendering the ALJ's decision unsupported by substantial evidence. (Id. at 14).

In response, the Commissioner maintains it was within the ALJ's discretion to determine whether additional medical evidence was necessary to develop the record. (Dkt. 21 at 18). Because the ALJ did not need this evidence to determine whether Charles was disabled, the Commissioner asserts that the ALJ did not err in failing to seek an updated consultative exam. (Id). Even without an updated assessment, the Commissioner contends that it was permissible for the ALJ to consider the new medical evidence and determine whether it showed that Charles' condition had worsened to a degree that would require the ALJ to obtain updated physical assessments and not rely on the reviewing doctors' prior opinions. (Dkt. 21

at 18). The Commissioner maintains that this evaluation was not an improper use of the ALJ's lay opinion, but instead, a proper and necessary consideration of the entire record in crafting Charles' RFC. (Dkt. 21 at 18). Furthermore, the Commissioner argues that the Plaintiff's argument regarding the need for an updated medical review of the new medical evidence is waived because the Plaintiff failed to raise this issue at the disability hearing. (Id. at 17).

The Seventh Circuit has repeatedly found error when an ALJ determines the significance of medical findings without seeking medical input. *See, e.g.*, *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) (the ALJ was not qualified to determine on his own whether MRI results corroborated the claimant's complaints "without the benefit of an expert opinion"); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (the ALJ was not qualified to assess on his own how an MRI's result related to other evidence in the record); *Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009) (vacating and remanding because the ALJ decided the severity of the claimant's symptoms without the opinion of a medical expert); *Terri R. v. Berryhill*, No. 2:17-CV-465-WTL-MJD, 2018 WL 4443002, at *6 (S.D. Ind. Sept. 18, 2018) (stating that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.").

In 2015, Dr. Wang conducted a consultative examination of Charles and based on the examination concluded that he was "probably able to do a light duty job continuously and moderate duty job intermittently" . . . and that he "may need a

mental disability evaluation for memory problem and the depression." (Dkt. 10-11, 59, R. 494).

Approximately two years after this assessment, while his case was pending with the SSA, an x-ray of Charles' lower back was completed on May 31, 2017. As the ALJ noted in her decision, the x-ray revealed mild lumbar dextroscoliosis with disc degenerative changes throughout the lumbar spine. (Dkt. 10-2 at 25, R. 24; Dkt. 10-15 at 36, R. 725). Based on Charles' continued complaints of lower back, hip, and leg pain during his June 9, 2017 visit, Physician Assistant Archer scheduled Charles for an MRI and follow-up appointment. (Dkt. 10-14 at 28, R. 690). Charles underwent an MRI on July 11, 2017, which was interpreted by Dr. Mulholland as follows:

> There is discogenic sclerosis surrounding a narrowed L3-4 intervertebral disc. There is no evidence for fracture or subluxation. There is a moderate-sized left paracentral herniated nucleus pulposus at L1-2. There is compression of the dural sac. There is no significant stenosis. There is a broad-based disc bulge at L2-3 with mild compression of the dural sac in the right lateral recess. There is no significant stenosis at this level. There is a moderate-sized left-sided herniated nucleus pulposus at L3-4 causing narrowing of the left lateral recess and neural foramen. There is a left-sided herniated nuclear pulposus at L4-5 neural foramen. The conus medullaris appears normal.

(Dkt. 10-15 at 49, R. 738). Dr. Mulholland's impressions included left paracentral herniated nucleus pulposus at L1-2, left-sided disc herniations at L3-4 and L4-5, and broad-based disc bulge at L2-3. (Id).

The ALJ reviewed the new medical data from the MRI and the x-ray and concluded that the overall evidence still supported Charles' physical functional

capacity for light work. (Dkt. 10-2 at 25, R. 24). Noting the x-ray findings of mild lumbar dextroscoliosis with disc degenerative changes throughout the lumbar spine and the MRI's results demonstrating herniated discs in Charles' lumbar spine, the ALJ, without submitting this new data to a medical expert, independently determined that the new evidence was not significant. (See Dkt. 10-2 at 27, R. 26).

The Plaintiff contends that the ALJ erred in assessing this new medical data and determining without medical input that the earlier physical assessments that determined Charles could perform light work were still reliable. (Dkt. 14 at 11, 14). The Commissioner argues that because the MRI showed only "mild degenerative disc disease, no indication of neurological involvement, and no treatment apart from [nonsteroidal anti-inflammatory drugs]," the ALJ did not err in failing to submit the new evidence to a medical expert. (Dkt. 21 at 16, 18).

In *Goins v. Colvin*, the plaintiff applied for SSI benefits alleging a disability based on acute pain resulting from a herniated spinal disc. 764 F.3d at 677, 678 (7th Cir. 2014). While her application was pending, the plaintiff underwent an MRI, which revealed degenerative disc disease, stenosis, and a Chiari I malformation. *Id.* at 679. The ALJ, accepting the earlier consulting physicians' conclusions, denied the plaintiff benefits, even though the consulting physicians did not review the new MRI report. *Id.* at 680. The Seventh Circuit held that the ALJ erred in failing to submit the MRI "to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence." *Id.*; *see also Moreno v. Berryhill*, 882 F.3d 722, 729 (7th Cir. 2018) (finding that the ALJ erred in making his own assessment

of the recent treatment records to conclude that they showed improvement and did not need to be submitted for medical input); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment.").

In assessing the medical evidence related to Charles' physical impairments, the ALJ discussed the results of Charles' MRI, stating:

> The claimant revealed 4/5 strength in his left lower extremity upon examination in 2017; however, an MRI taken in July 2017 was negative for cord compromise or significant canal stenosis. The MRI showed left paracentral herniated nucleus pulpous at L1-L2, herniated discs at L3-L4 and L4-L5, and broad based disc bulging at L2-L3; however, there was no indication for neurogenic involvement. Notably, a corresponding x-ray of the spine indicated mild degenerative disc disease.

(Dkt. 10-2 at 25, R. 24). Without any medical input, the ALJ independently assessed the 2017 x-ray and the 2017 MRI of Charles' lumbar spine. Even though there is no evidence in the record that the reviewing physicians were aware of the herniated discs or dextroscoliosis in Charles' back which was discovered with the MRI and x-ray, the ALJ interpreted this raw medical data to determine that Charles was still capable of performing simple and routine light work. (Id. at 26, R. 25).

The Seventh Circuit has repeatedly held that an ALJ may not "play doctor" and interpret "new and potentially decisive medical evidence" without medical scrutiny. *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *see also Brown v. Saul*, No. 19-1363, 2020 WL 119589, at *3 (7th Cir. Jan. 10, 2020). The ALJ here was not qualified or authorized to determine that Charles' MRI and x-ray results showing mild degenerative disc disease throughout the lumbar spine,

dextroscoliosis, and herniated discs did not have an effect on his supposed ability to perform light work. Without medical evidence to support her conclusion that Charles maintained the ability to stand and walk in combination for six hours in a workday, upon which the ALJ's denial of benefits depended, the ALJ's physical RFC assessment lacks substantial evidence in the record. Here, the ALJ relied on the outdated physical assessments of the state agency doctors in formulating Charles' RFC; thus, this case is remanded to the SSA in order to submit the new evidence to medical scrutiny before the ALJ determines Charles' physical functional capacity.

The Plaintiff also maintains that the RFC is faulty for another reason. According to Charles, the ALJ failed to submit new mental health evidence that would demonstrate Charles' worsening mental health and the need for a mental health limitation in the RFC. (Dkt. 14 at 14). To support his argument, the Plaintiff maintains that the ALJ should have submitted evidence of Charles' psychotropic medication changes, his unwillingness to go out of his home, and his "concerns about suicide causing medication changes" to the reviewing mental health physicians. (Dkt. 14 at 14). The Plaintiff, however, fails to direct the Court to any raw medical data or new mental health treatment records that the ALJ impermissibly interpreted or ignored.

On June 10, 2015, state agency reviewing psychologist, Dr. Lovko, was on notice of Charles' memory loss, his depression, unwillingness to go out of the home, and his placement on psychotropic medications by his primary care physician. (Dkt. 10-3 at 11-12, R. 86-87). With that evidence, Dr. Lovko still found that Charles'

"allegation of severity of functioning" was not supported by the totality of the medical evidence. (Dkt. 10-3 at 12, R. 87). Dr. Lovko concluded that, to the extent that Charles was physically capable, he could understand, remember, and carry-out unskilled tasks. (Id).

In May 2016, as a possible result of his psychotropic medications, Charles experienced a drop in his blood sodium level. (Dkt. 10-12 at 50-51, 53, R. 564-65, 567). He was instructed to discontinue a number of his medications, including the numerous mental health prescriptions. (Id. at 48, R. 562). By June 2016, Charles had secured a new primary care physician and had begun addressing his issues with anxiety, depression, and irritation symptoms, (Dkt. 10-14 at 2, R. 664), through consistent counseling sessions and psychotherapy treatment. (Dkt. 10-14 at 5, R. 667; Dkt. 10-16 at 2, R. 742). The treatment records from 2016 demonstrate that Charles was doing well on his medications, and that he had an appropriate mood and affect. (Dkt 10-14 at 18, R. 680). In 2017, Charles' treatment notes indicated that Charles was doing well on his current anxiety and depression medications and that he had improved in his mood and fluctuations. (Id. at 28, R. 690). Unlike the MRI and the x-ray findings that potentially demonstrated additional physical limitations for Charles, there are no medical data or treatment notes that the ALJ impermissibly interpreted regarding Charles' mental health. Instead of a worsening mental health condition, Charles' mental records show that his overall mental health improved while this case was pending. Thus, the Court

declines to find that the ALJ erred in determining that Charles did not need greater mental limitations than those recognized by the state agency reviewers.

## 2. *Agency Consultant Opinion of Dr. Powell*

Charles next contends that the ALJ erred in giving little weight to the findings and conclusions of psychologist and consultative examiner Dr. Leah Powell, (Dkt. 10-11 at 46, R. 481), who conducted a psychological examination of Charles on June 22, 2015. (Dkt. 14 at 12-13). In response, the Commissioner argues that the ALJ appropriately assigned limited weight to Dr. Powell's opinion because her opinion was extreme and unsupported by Charles' other treatment records. (Dkt. 21 at 22). Even though Dr. Powell concluded that Charles had evidence of distractibility, limited recall, and significant cognitive impairments that contraindicated with work-related activities, the Commissioner notes that all of the reviewing agency doctors disagreed with this assessment. (Dkt. 21 at 22). Instead, the reviewing physicians determined that, in the context of his ninth grade education and the record as a whole, Charles' examination findings did not reflect severe cognitive or memory impairments. (Dkt. 21 at 22).

Weighing conflicting evidence from medical experts is what ALJs are required to do. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citing *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (pointing out that when assessing conflicting medical evidence, an ALJ must decide, based on several considerations, which doctor to believe). ALJs generally "give more weight to the medical opinion of a source who has examined [a claimant] than to the medical opinion of a medical

source who has not examined [a claimant]." 20 C.F.R. § 416.927(c). If the ALJ determines that no medical opinion in the record deserves controlling weight, the ALJ must consider every opinion in the record according to the relevant regulatory factors, which include: whether the physician examined the claimant; whether the physician treated the claimant frequently or for an extended period of time; the nature and extent of the treatment relationship; whether the medical source opinion is supported by relevant medical evidence; whether the physician specialized in treating the claimant's condition; and whether the offered opinions are consistent with the objective medical evidence and the record as a whole. 20 C.F.R. § 416.927(c).

In this case, Dr. Leah Powell performed a consultative psychological evaluation of Charles on June 22, 2015, concluding that Charles' "presentation, level of functioning, and cognitive abilities [were] contraindicated with work-related activities." (Dkt. 10-11 at 51, R. 486). On June 10, 2015, state agency reviewing psychologist Dr. Lovko disagreed, finding that Charles' cognitive abilities did not reflect the impairments in functioning suggested by Dr. Powell. (Dkt. 10-3 at 12, R. 87). On October 16, 2015, state agency reviewing psychologist Dr. Larsen adopted Dr. Lovko's findings regarding Charles' mental limitations. (Id. at 27-28, R. 102-03). The ALJ, considering the regulatory factors, concluded:

> Dr. Powell's opinion is afforded limited weight because it is based on a single examination and heavily on the claimant's subjective complaints. Her interpretation of the memory test is reliable, but DDS reviewed her impression and gained the opinion the claimant could understand, remember, and carry out simple and routine tasks. Overall, the undersigned affords greater weight to

> DDS' psychological assessment because it is based on a wider
> range of evidence.

(Dkt. 10-2 at 26, R. 25).

Here, the ALJ reasonably considered Dr. Powell's opinion, but appropriately attributed little weight to the opinion. None of Charles' treating physicians or reviewing doctors identified the cognitive impairments diagnosed by Dr. Powell. The ALJ found that Charles' treating physician notes did not indicate difficulty communicating with Charles, but instead demonstrated that Charles exhibited normal behavior and adequate cognitive processing abilities on medical examinations. (Dkt. 10-2 at 26, R. 25). Moreover, unlike Dr. Powell, the reviewing state agency doctors, whom the ALJ gave great weight, had the advantage of reviewing Charles' complete medical history to assess whether their opinions were consistent with other reports and mental health examinations. Based on the totality of the record, the reviewing agency doctors determined that Dr. Powell's findings were not credible, and the ALJ was permitted to rely on these assessments. The Court finds that substantial evidence supports the ALJ's decision to afford Dr. Powell's opinion limited weight.

Taking Dr. Powell's opinion and the more recent medical evidence regarding Charles' mental health treatment into consideration, the ALJ crafted a mental RFC that limited Charles to simple, routine, tangible, and repetitive work allowing him to be off task for five percent of the workday with regularly scheduled breaks, no contact with the public, and no tandem tasks with co-workers or supervisors. (Dkt. 10-2 at 21, R. 20). Because the ALJ provided sufficient reasons for giving Dr.

Powell's opinion limited weight, the Court finds that she appropriately built an "accurate and logical bridge from the evidence to [her] conclusion," and denies the Plaintiff's request for remand on this issue.

### 3. *Waiver*

The Commissioner maintains that because Charles failed to raise the argument concerning the need for medical input at the administrative hearing, this Court should find that the issue is waived. The record from Charles' disability hearing, however, does not support the Commissioner's argument. Rather, it demonstrates that Plaintiff's counsel put the ALJ on notice that while Charles' application was pending, he continued to experience chronic pain and shortness of breath. (Dkt. 10-2 at 40, R. 39). Plaintiff's counsel also referred the ALJ to a recent MRI which demonstrated a new issue concerning Charles' back pain. (Id). Moreover, during Charles' testimony, he explained to the ALJ that he had been recently diagnosed with two ruptured discs and two deteriorating discs in his lower back. (Dkt. 10-2 at 22, R. 43). Both Plaintiff's counsel's statements and Charles' own testimony regarding the new medical data and diagnosis should have put the ALJ on notice that further development of the record was potentially needed. (Dkt. 10-2 at 39-41, R. 38-40). For these reasons, the Court finds that this argument was not waived.

### B. Whether the ALJ Failed to Incorporate Charles' Mental Limitations in the Hypothetical Question Posed to the Vocational Expert

Lastly, the Plaintiff argues that the ALJ erred in failing to include all of his mental limitations in the hypothetical question posed to the vocational expert at his disability hearing. (Dkt. 14 at 16). Specifically, the Plaintiff asserts that the ALJ erred in failing to account for Charles' moderate limitations in concentration, persistence, and pace and his moderate limitations in understanding, remembering, and applying information in the hypothetical question that she posed to the vocational expert. (Id. at 17). The Commissioner asserts that the ALJ accounted for all of Charles' limitations and incorporated these limitations in the hypothetical by limiting Charles to the performance of simple, routine, tangible, and repetitive work. (Dkt. 21 at 25).

The Seventh Circuit maintains that both the hypothetical posed to the vocational expert and the residual functional capacity assessment must incorporate all of the claimant's limitations supported by the medical record. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

Here, the ALJ found Charles to have moderate limitations in concentration, persistence, or pace. (Dkt. 10-2 at 21, R. 20). The ALJ also found that Charles had moderate limitations in understanding, remembering, or applying information. (Id. at 20, R. 19). As noted above, the ALJ's RFC assessment limited Charles to simple, routine, tangible, and repetitive work; to work with no contact with the public; work

that would not require Charles to perform tandem tasks with coworkers and supervisors; and work that allowed him to be off task 5 percent of the workday, in addition to regularly scheduled breaks. (Dkt. 10-2 at 21, R. 20). During Charles' disability hearing, the ALJ posed a hypothetical question to the vocational expert using language nearly identical to her eventual mental RFC assessment. The ALJ posed the following question to the vocational expert:

> [I]f there was a hypothetical person who had a vocational profile of being a younger person with a limited education and the same past relevant work experience that you've described for this particular claimant and . . . they would be limited to simple, routine, tangible and repetitive work. They would need work that would allow them to be off task 5% of the workday in addition to regularly scheduled breaks. They'd need to work with no interaction with the public and no tandem tasks with coworkers or supervisors. Could that person perform any of the claimant's past work within this hypothetical?

(Dkt. 10-2 at 71-72, R. 70-71).

The Plaintiff contends that this hypothetical failed to contain Charles' moderate limitations in concentration, persistence, or pace or his moderate limitations in understanding, remembering, or applying information. (Dkt. 14 at 17). In particular, the Plaintiff argues that the ALJ's limitation to "simple, routine, repetitive and tangible, without tandem tasks," does not flesh out Charles' moderate mental health limitations. (Dkt. 14 at 16-17).

While it is well-established that the hypothetical posed to the vocational expert "must incorporate all the claimant's limitations," an ALJ may reasonably rely upon the opinion of a medical expert when formulating the hypothetical question. *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019). The hypothetical

question posed to the vocational expert is sufficient if it is supported by the medical evidence in the record. *Id*. (citing *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987)); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (in formulating hypothetical for vocational expert, ALJ relied on physician's opinion that plaintiff could perform low-stress, repetitive work).

As noted previously, Dr. Lovko, who addressed Charles' concentration, persistence, pace, understanding, and memory limitations, concluded that Charles could "understand, remember, and carry out unskilled tasks without special considerations in many work environments." (Dkt. 10-3 at 12, R. 87). Dr. Lovko also determined that Charles was able to "relate on a superficial and ongoing basis with co-workers and supervisor" and that he could "attend to task for sufficient periods of time to complete tasks." (Id). Dr. Lovko concluded that Charles could "manage the stresses involved with unskilled work." (Id. at 12, R. 87). Addressing Charles' understanding, memory, concentration and persistence limitations, Dr. Lovko determined that Charles was not significantly limited in his ability to remember, understand, or carry out short and simple instructions. (Id. at 10, R. 85). Dr. Lovko found that Charles was able to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary routine without special supervision. (Dkt. 10-3 at 10, R. 85). Dr. Lovko did, however, find Charles moderately limited in his ability to "complete a normal workday or workweek without interruptions from psychologically based symptoms

and to perform at a consistent pace without an unreasonable number and length of rest periods." (Dkt. 10-3 at 10-11, R. 85-86).

Here, the ALJ did not merely assume that limiting Charles to simple, routine and repetitive work would account for all of his limitations. Rather, she relied on and incorporated the expert opinion of the state agency psychologist who reviewed Charles' medical records. In particular, the ALJ gave great weight to Dr. Lovko's opinion, which concluded that although Charles had moderate limitations in concentration, persistence, or pace, he would still be able to "understand, remember and carry out unskilled tasks" . . . "for sufficient periods of time to complete tasks." (Dkt. 10-3 at 12, R. 87). The ALJ posed a hypothetical question to the vocational expert that reflected Dr. Lovko's opinion and took into account Charles' moderate limitations and his need for breaks. Therefore, the Plaintiff has failed to show that the ALJ's hypothetical question concerning his mental limitations was improper.

The Court notes that the Plaintiff includes a one-liner at the end of his brief arguing that Charles' significant memory deficits, issues with distractibility, shortness of breath, coughing fits, racing thoughts, and back pain would also take a toll on his concentration, persistence, or pace. (Dkt. 14 at 17). An argument that is "perfunctory and undeveloped" may be treated as waived. *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018). By failing to provide factual detail and supporting legal authority, this argument is perfunctory and is, therefore, waived.

## V.   CONCLUSION

For the reasons detailed herein, this court **REVERSES** the ALJ's decision denying Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four) as detailed above. Final judgment will issue accordingly.

So ORDERED.


Date: 3/11/2020

_Doris L. Pryor_
Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.